# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AMANDA BUKATA, | : | CIVIL ACTION NO. |
| Plaintiff | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| VCS GROUP, LLC d/b/a | : | |
| THE CAMUTO GROUP, | : | |
| Defendant | : | |

## COMPLAINT

Plaintiff, Amanda Bukata, hereby complains and alleges that Defendant, VCS Group, LLC, d/b/a The Camuto Group, violated her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000(e), et seq., as amended, the Connecticut Fair Employment Act ("FEPA"), Conn. Gen. Stat. 46a-60, and common law claims of intentional and negligent infliction of emotional distress.

## PARTIES

1.      Plaintiff, Amanda Bukata ("Ms. Bukata"), is an individual, who resides at 353 W. 5th Street, Conshohocken, PA 19428.

2.      Defendant, VCS Group, LLC, d/b/a The Camuto Group, ("The Camuto Group"), a limited liability company under the laws of the State of Connecticut, operates a national fashion and design firm with its principal place of business at 411 West Putnam Avenue, Greenwich, CT 06830.

## JURISDICTION

3.      On or about June 13, 2009, the plaintiff timely filed her complaint with the Connecticut Commission of Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC").

4. More than 210 days have elapsed since the filing of her complaint.

5. On January 19, 2010 plaintiff's CHRO counsel received a "Release of Jurisdiction" from the Connecticut Commission on Human Rights and Opportunities issued in regard to Ms. Bukata's claims previously filed under FEPA. The Release of Jurisdiction is attached hereto as Exhibit A. On April 7, 2010, the Equal Employment Opportunity Commission issued a "Right to Sue" letter in regard to Ms. Bukata's previously cross-filed claims under Title VII. The "Right to Sue" letter is attached hereto as Exhibit B

6. Less than 90 days have elapsed since plaintiff's receipt of her Release of Jurisdiction and Right to Sue.

7. At all material times, VCS employed at least twenty (20) employees and therefore was/is subject to state and federal anti-discrimination laws.

8. At all relevant times herein, the actions complained of herein, which lead to and culminated in Ms. Bukata's unlawful and discriminatory constructive discharge on December 20, 2007, were undertaken and performed by officers and/or employees of the Camuto Group, either alone or in conjunction, concert, and agreement with other officers and/or employees of the Camuto Group.

9. At all times relevant herein, the Camuto Group acted by and through its authorized officers, agents, servants, employees, and representatives, who at all times acted with the knowledge and authority of the defendant, on behalf of defendant, and within the course and scope of their authority, agency or employment.

10. This Court has subject matter jurisdiction over Count I hereof pursuant to 42 U.S.C. § 2000e et seq., and 28 U.S.C. § 1331. This Court has pendent jurisdiction over the state law claims in Counts II - IV pursuant to 28 US.C. §1367.

## VENUE

11.     Pursuant to 28 U.S.C. §1391(b)(1)and(2), the District of Connecticut is the proper venue for this dispute since a substantial part of the events giving rise to the claims occurred within this judicial district.

## FACTS

12.     Ms. Bukata was hired by the Camuto Group on June 1, 2005 as a line builder under the "Jessica Simpson" shoe brand.

13.     Ms. Bukata's duties related to product color, texture and design and acting as a liaison between the sales and design departments.

14.     Ms. Bukata worked at the Camuto Group's office in Greenwich, Connecticut and also worked two to three days a week at her home in Pennsylvania for a period of a few months.

15.     Ms. Bukata reported to and was supervised by Neal Salisbury, design director, for the Camuto Group.

16.     Mr. Salisbury had authority to hire, fire and discipline employees.

17.     Mr. Salisbury reported directly to Vincent Camuto, the owner of the Camuto Group.

18.     During the course of her employment, Ms. Bukata was subject to repeated sexual harassment and offensive touching by Mr. Salisbury which continued throughout her employment with the Camuto Group.

19.     Mr. Salisbury's and the Camuto Group's improper, offensive and unlawful treatment of Ms. Bukata was continuous and included the following:

        a.     Ms. Bukata traveled to Brazil on company business frequently. Many of the females who traveled to Brazil from the Camuto Group wore very small bikinis and

clothing on such trips. Ms. Bukata wore dresses on such trips. Mr. Salisbury chastised her for the dresses she wore and told her not to wear such clothing;

  b. On a trip to Brazil, one of the male workers was evidently upset at Ms. Bukata and threw a bunch of leathers at her. Ms. Bukata complained to the Camuto Group's human resources representative via email. Mr. Salisbury had knowledge of her complaint. Neither the human resources representative nor Mr. Salisbury took any action to address the situation;

  c. Mr. Salisbury made daily comments to Ms. Bukata that were inappropriate and made her extremely uncomfortable including:

    (1) Commenting that Ms. Bukata had lost weight and stating "now I would date you";

    (2) Commenting about Ms. Bukata's outfits and her physical appearance;

    (3) Commenting about Ms. Bukata's face, makeup, her haircut and that she should wear a particular outfit more frequently;

    (4) In Ms. Bukata's presence, discussing in detail his sex life with his own girlfriend and other partners with whom he was having sexual relations;

    (5) Providing a description of his assistant (Tamara) in the workplace with whom he was having a sexual relationship;

    (6) Providing graphic description of those persons in the industry with whom he would like to sleep;

    (7) Providing detailed descriptions regarding his escapades in the strip bars of Spain

  d. Mr. Salisbury allowed his sexual relationship with his assistant (Tamara)

to directly impact work events, including those relating to Ms. Bukata, as Ms. Bukata was that assistant's direct manager and unfortunately, Mr. Salisbury engaged in "pillow talk" with the assistant and undermined Ms. Bukata's authority and ability to manage the assistant properly and effectively. Ms. Bukata repeatedly advised Mr. Salisbury of this problem;

 e. Mr. Salisbury sent improper emails to and/or related to Ms. Bukata, which included:

> (1) email of June 20, 2006 copied to Ms. Bukata stating: "Amanda told me tell you because her computer is not working that she would like you to bring a nice suit and tie because she wants to take you out to dinner (ALONE). Also she says it probably would be better if you could leave Monday because you'll be too tired on Sunday; whatever that means.
>
>       Neal
>
> P.S. Sorry, _____. I don't know why she changed her mind towards _____. It must have been she got jealous on that way home from Maleu."
>
> (2) Email of June 25, 2007 directed to Ms. Bukata, starting with "Hello my love,"
>
> (3) Email of July 7, 2006 copied to Ms. Bukata stating, "I fought your long lost lover. Check out your old/hot Brazilian lover. It looks like he put something in her mouth. Love, Amanda". Mr. Salisbury also attached an offensive, graphic picture of scantily clad girls to this email.
>
> (4) Email of July 11, 2007 to Ms. Bukata stating, "It really hurts me that you

can't be honest. After all I have push you to be, taught to you and given to you; honesty in the eyes, no look away handshakes my soul, my mind, my thoughts, my friendship and my heart. Hopefully someday you'll understand what this means! I'm really hurt. Neal"

(5) Email of July 12, 2007 to Ms. Bukata stating, "I am dropping the conversation from this morning. You aren't seeing how my feelings have been hurt. I want to put it behind me; I can't waist any more energy on it and I don't want it to ruin our friendship. I'm more sensitive and open with feelings then you. I love you and I love our friendship and don't want that to be lost. So hopefully with that being said; you can drop the strong emails and attitude. Start writing these strong emails to Gene, Christene, Emily, etc; as you are doing a great job of it with me."

20. Mr. Salisbury made inappropriate, offensive and discriminatory comments about other employees of the Camuto Group in Ms. Bukata's presence.

21. During the many occasions in which Mr. Salisbury engaged in offensive and/or inappropriate conduct or made that type of comment to Ms. Bukata, Ms. Bukata identified her concern and dissatisfaction to him.

22. When Mr. Salisbury spoke concerning sexual actions, Ms. Bukata would cover her ears and say, "I don't want to hear this", "Sick", "Gross", and/or "Please stop", as well as other terms to advise Mr. Salisbury that she was repulsed by what he was saying in the workplace and/or about Camuto Group employees.

23. Such efforts were not successful with this individual and Mr. Salisbury went so far as to ask Ms. Bukata about her sexual activities and romantic relationships on a trip

she took to Spain.

24. Mr. Salisbury also made comments and inquiries on a frequent basis regarding Ms. Bukata's dating activities and statements inferring that she was promiscuous.

25. Mr. Salisbury pressured Ms. Bukata to provide him with personal information about her social relationships.

26. In the workplace, Mr. Salisbury frequently approached Ms. Bukata from behind and grabbed her shoulders with both hands and began massaging her shoulders. When this occurred, Ms. Bukata would tense up and identified her disagreement with his touching actions.

27. Mr. Salisbury commented numerous times after Ms. Bukata indicated her disagreement with such touching by Mr. Salisbury, stating that she was always "so cold and unemotional."

28. Mr. Salisbury promised to double Ms. Bukata's salary to $160,000 per year and stated that the Camuto Group would also provide her with a percentage of sales as part of her compensation. As the Jessica Simpson shoe line on which Ms. Bukata worked grossed approximately ninety million dollars ($90,000,000) in sales annually, a percentage of gross sales would have been substantial.

29. Ms. Bukata repeatedly complained to Mr. Salisbury to cease and refrain from his offensive, severe and pervasive comments and conduct directed to Ms. Bukata, as well as other female employees, but such conduct, regrettably, continued unabated.

30. At the time of the illegal conduct by Mr. Salisbury in his supervisory capacity with The Camuto Group, the company did not maintain a readily accessible and effective policy for reporting and resolving complaints of sexual harassment.

31. During the term of her employment with the Camuto Group, Ms. Bukata was

never supplied with a copy of a human resources manual or handbook.

32. Ms. Bukata was never provided with any internal company policy related to the submission of complaints of harassment in the workplace and the investigative and remedial process, if any, to be followed after submission of a complaint.

33. The Camuto Group did not train its non-supervisory design employees in Ms. Bukata's department regarding sexual harassment and/or complaint procedures.

34. The Camuto Group did not supply a completed sexual harassment policy to Ms. Bukata.

35. On December 20, 2007, Ms. Bukata was effectively constructively discharged as a result of the unlawful harassment and treatment she received in the workplace from and by Mr. Salisbury.

36. The human resources department at the Camuto Group was woefully deficient in both form and substance and the practices utilized at Ms. Bukata's exit interview were coercive, retaliatory and improper.

37. Ms. Bukata was forced to prepare two resignation letters at the request of Mr. Salisbury and Christene Hayles, Human Resources Director of the Camuto Group.

38. During Ms. Bukata's exit interview with Mrs. Hayles, Ms. Bukata told Mrs. Hayles that some of the problems began approximately eight months prior thereto. Mrs. Hayles stated to Ms. Bukata, "I'm not an idiot. I know what happened eight months ago." Mrs. Hayles then pushed Ms. Bukata to provide a reason as to why she was leaving the company. Mrs. Hayles stated, "Are we at risk for a lawsuit?" Ms. Bukata was upset and did not respond. Mrs. Hayles stated, "By you not responding, that means 'yes'".

39. Ms. Bukata was extremely upset at this exit interview and was crying at various

times.

40. Mrs. Hayles advised Ms. Bukata that the company would be enforcing a non-compete agreement for a full twelve months, despite the company's history of not fully enforcing non-compete provisions, and that Ms. Bukata would not receive a severance package. Mrs. Hayles asserted that no severance would be provided because Ms. Bukata would not provide a reason for her resignation. Such actions by The Camuto Group and Mrs. Hayles were retaliatory and unlawful and were in response to her constructive discharge and resignation from The Camuto Group.

41. Prior to resigning, Ms. Bukata advised Mr. Salisbury that she was leaving the company. He inquired as to "what number it would take" for Ms. Bukata to remain employed by The Camuto Group and she stated that no number would suffice, as she would not be happy there in that work environment.

42. Mrs. Hayles is the HR manager and was required to follow ethical human resources practices by maintaining confidentiality regarding employee issues.

43. Mrs. Hayles breached this confidentiality requirement in the past, related to Ms. Bukata, as confirmed by Mr. Salisbury and of which Ms. Bukata was aware.

44. Mrs. Hayles had a close friendship with Mr. Salisbury.

45. The Camuto Group's illegal actions and resultant constructive discharge of Ms. Bukata not only resulted in her separation from employment, but also her exclusion from the shoe industry, based on the Company's selective and retaliatory full enforcement of a non-compete provision.

## COUNT I
## HOSTILE WORK ENVIRONMENT UNDER
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964(42 U.S.C. § 2000e et seq), AS AMENDED

46.     Ms. Bukata incorporates the allegations contained in paragraphs 1 through 43 above, as if fully set forth herein.

47.     On a regular basis, throughout her employment with the Camuto Group, Ms. Bukata was subject to repeated sexual harassment including comments and offensive touching by Mr. Salisbury motivated by Ms. Bukata's gender.

48.     The conduct to which Ms. Bukata was subjected was severe and pervasive and created a hostile work environment.

49.     The conduct to which Ms. Bukata was subjected would be equally offensive to a reasonable person.

50.     Mr. Salisbury's conduct constituted a continuing course of conduct.

51.     The Camuto Group did not exercise reasonable care to prevent or correct the harassing behavior as evidenced by the lack of a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, the failure to supply a completed sexual harassment policy to Ms. Bukata and the failure to investigate upon learning of the conduct.

52.     Based on the foregoing, the Camuto Group violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Ms. Bukata to a hostile work environment on the basis of her gender.

53.     Defendant knowingly, willfully, and intentionally discriminated against Ms. Bukata by constructively discharging her from her employment because of her gender, in bad faith and with the intent to damage and injure Ms. Bukata. Defendant's actions were outrageous

and in reckless disregard of Ms. Bukata's rights and interests.

54. At the time she was fired, Ms. Bukata was earning a salary of eighty thousand dollars ($80,000). In addition, Ms. Bukata reasonably expected that her salary/compensation would be increased periodically in the normal course of business.

55. Until her discharge, Ms. Bukata was also earning and/or receiving numerous valuable benefits, including, *inter alia*, group major medical, dental and health insurance coverage.

56. As a direct and proximate result of Defendant's improper, unlawful and discriminatory actions toward Ms. Bukata, including her discharge, Ms. Bukata has been denied employment with Defendant and precluded promotions and all salary, compensation, benefits, and other increments to which she was or would have become entitled.

57. As a further direct and proximate result of Defendant's improper, unlawful, and discriminatory actions and discharge of Ms. Bukata, Ms. Bukata has incurred a substantial loss of wages, bonuses, earnings, and benefits, which losses are likely to continue for an indefinite time in the future.

58. As a further result of the defendant's conduct, Ms. Bukata has suffered emotional distress.

## COUNT II
## HOSTILE WORK ENVIRONMENT UNDER
## TITLE VII (42 U.S.C. § 2000e et seq) -CONSTRUCTIVE DISCHARGE

59. Ms. Bukata incorporates the allegations contained in paragraphs 1 through 59 above, as if fully set forth herein.

60. Mr. Salisbury's sexual harassment culminated in Ms. Bukata's constructive discharge as her work conditions became so intolerable that she had no other recourse but to

resign from her position.

61. The conduct to which Ms. Bukata was subjected was severe and pervasive and created a hostile work environment

62. Additionally, the Camuto Group did not have a readily accessible or effective procedure for reporting and resolving complaints of sexual harassment.

63. A reasonable person in Ms. Bukata's position would have felt compelled to resign.

64. Defendant knowingly, willfully, and intentionally discriminated against Ms. Bukata by constructively discharging her from her employment because of her gender, in bad faith and with the intent to damage and injure Ms. Bukata. Defendant's actions were outrageous and in reckless disregard of Ms. Bukata's rights and interests.

65. At the time she was fired, Ms. Bukata was earning a salary of eighty thousand dollars ($80,000). In addition, Ms. Bukata reasonably expected that her salary/compensation would be increased periodically in the normal course of business.

66. Until her discharge, Ms. Bukata was also earning and/or receiving numerous valuable benefits, including, *inter alia*, group major medical, dental and health insurance coverage.

67. As a direct and proximate result of Defendant's improper, unlawful and discriminatory actions toward Ms. Bukata, including her discharge, Ms. Bukata has been denied employment with Defendant and precluded promotions and all salary, compensation, benefits, and other increments to which she was or would have become entitled.

68. As a further direct and proximate result of Defendant's improper, unlawful, and discriminatory actions and discharge of Ms. Bukata, Ms. Bukata has incurred a substantial loss of

wages, bonuses, earnings, and benefits, which losses are likely to continue for an indefinite time in the future.

## COUNT III
## HOSTILE WORK ENVIRONMENT UNDER FEPA (Conn. Gen. Stat. § 46a-60(a)(8)(c))

69. Ms. Bukata incorporates the allegations contained in paragraphs 1 through 69 above, as if fully set forth herein.

70. On a regular basis, throughout her employment with the Camuto Group, Ms. Bukata was subject to repeated sexual harassment, including comments and offensive touching by Mr. Salisbury motivated by Ms. Bukata's gender.

71. The conduct to which Ms. Bukata was subjected was severe and pervasive and created a hostile work environment that altered the conditions of Ms. Bukata's employment.

72. Based on the foregoing, the Camuto Group violated Connecticut General Statutes Sec. 46a-60(a)(8) by subjecting Ms. Bukata to a hostile work environment based upon her sex.

73. Defendant knowingly, willfully, and intentionally discriminated against Ms. Bukata by constructively discharging her from her employment because of her gender, in bad faith and with the intent to damage and injure Ms. Bukata. Defendant's actions were outrageous and in reckless disregard of Ms. Bukata's rights and interests.

74. At the time she was fired, Ms. Bukata was earning a salary of eighty thousand dollars ($80,000). In addition, Ms. Bukata reasonably expected that her salary/compensation would be increased periodically in the normal course of business.

75. Until her discharge, Ms. Bukata was also earning and/or receiving numerous valuable benefits, including, *inter alia*, group major medical, dental and health insurance coverage.

76. As a direct and proximate result of Defendant's improper, unlawful and

discriminatory actions toward Ms. Bukata, including her discharge, Ms. Bukata has been denied employment with defendant and precluded promotions and all salary, compensation, benefits, and other increments to which she was or would have become entitled.

77. As a further direct and proximate result of Defendant's improper, unlawful, and discriminatory actions and discharge of Ms. Bukata, Ms. Bukata has incurred a substantial loss of wages, bonuses, earnings, and benefits, which losses are likely to continue for an indefinite time in the future.

**COUNT- FOUR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

78. Ms. Bukata incorporates the allegations contained in paragraphs 1 through 78 above, as if fully set forth herein.

79. Mr. Salisbury's conduct towards Ms. Bukata was extreme and outrageous.

80. Mr. Salisbury's conduct towards Ms. Bukata caused her extreme emotional distress.

**COUNT FIVE – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

81. Ms. Bukata incorporates the allegations contained in paragraphs 1 through 81 above, as if fully set forth herein.

82. Defendant knew or should have known that its conduct involved an unreasonable risk of causing the plaintiff emotional distress.

83. Defendant knew or should have known that such emotional distress was likely to result in plaintiff's illness or bodily harm.

84. Defendant's conduct caused plaintiff \emotional distress.

85. Defendant's conduct took place as part of plaintiff's termination process.

WHEREFORE, for the foregoing reasons, under all Counts herein, Ms. Bukata demands that judgment be entered against Defendant as follows:

(a) that Ms. Bukata be granted judgment against defendant for all lost compensation, back pay, and benefits, including increments in back pay and benefits, front pay and interest from and after December 20, 2007;

(b) that judgment be entered in favor of Ms. Bukata and against Defendant in such amount(s) as is/are necessary to reimburse her for any and all present and future lost wages and benefits, out-of-pocket expenses she has incurred in looking for new employment, replacing lost benefits, otherwise attempting to mitigate her losses, and obtaining needed medical care, attention, and medications, plus interest;

(c) that judgment be entered in favor of Ms. Bukata and against Defendant in such amount as appropriate as compensatory damages for pain and suffering, humiliation and embarrassment.

(d) that judgment be entered in favor of Ms. Bukata and against Defendant for the reasonable counsel fees and costs incurred and/or expended in this action and in prior administrative proceedings, and/or otherwise incurred and/or expended on and after December 20, 2007, including, without limitation, the costs of or related to expert witnesses;

(e) that, due to Defendant's knowing, willful, outrageous, and malicious actions in violation of law, and in reckless disregard of Ms. Bukata's rights and interests, judgment be entered in favor of Ms. Bukata and against Defendants, jointly and severally, for punitive damages;

(f) that this Court enter such further order and grant such further legal and/or equitable relief as law and justice may require.

**RESPECTFULLY SUBMITTED,
THE PLAINTIFF**

By: _____
     Lewis H. Chimes
     *Federal bar No.: ct07023*
     GARRISON, LEVIN-EPSTEIN, CHIMES
     RICHARDSON, and FITZGERALD, P.C.
     405 Orange Street
     New Haven, CT 06516
     Ph: (203) 777-4425
     Fax: (203) 776-3965
     lchimes@garrisonlaw.com